IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

APR 2 4 2023

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:23-cr-55 |
| | ) | |
| POLINA L. PERELMAN, | ) | |
| | ) | |
| Defendant. | ) | |

STATEMENT OF FACTS

The United States and the defendant, POLINA L. PERELMAN, agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

[handwritten: CCS  2022  PP  MDC]

1. On or about August 19, ~~2023~~ [2022], in Loudoun County, Virginia, within the Eastern District of Virginia, PERELMAN, willfully and knowingly and with intent to defraud the United States, attempted to smuggle into the United States merchandise which should have been invoiced, and attempted to pass through the customshouse a false document.

THE RELEVANT STATUTES

2. The United States and 182 other countries are signatories to a multilateral treaty called the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), 27 U.S.T. 1087, T.I.A.S. No. 8249 (July 1, 1975). CITES provides a mechanism for regulating international trade in fish, plant, and wildlife species whose survival is considered threatened by trade. By agreement of the signatories, such fish, plants, and wildlife are placed on one of three appendices, depending on the level of protection needed for the species. International trade in species listed on these appendices is monitored and regulated by permits

and quotas. The permit restrictions apply to live and dead specimens, as well as parts and products made in whole or in part from a listed species.

3. Fish, plant, and wildlife species considered to be most in danger of extinction due to trade are listed on Appendix I of CITES. International trade in these species is strictly regulated, and commercial trade in them is largely prohibited. Fish, plant, and wildlife species listed in Appendix II of CITES are those that are not necessarily threatened with extinction now, but may become threatened with extinction unless trade is strictly regulated to prevent use incompatible with their survival. Appendix II species may be traded internationally for commercial purposes, but only after a valid permit/certificate is first issued by the exporting country. A CITES re-export permit is then required each time the wildlife transits any subsequent international border.

4. CITES is implemented in the United States by the Endangered Species Act ("ESA"), which directs the U.S. Fish and Wildlife Service to administer CITES, *see* 16 U.S.C. §§ 1537a, 1540(f), and provides criminal penalties for those who knowingly trade in any specimen contrary to the provisions of CITES, or possess any specimen traded contrary to CITES, *see* 16 U.S.C. §§ 1538(c)(l), 1540(b)(l).

5. The U.S. Fish and Wildlife Service has promulgated regulations incorporating the specific permit requirements and provisions of CITES and listing the species contained on the CITES appendices, which are found in Title 50, Code of Federal Regulations ("C.F.R."), Part 23. Those regulations, along with provisions contained in 50 C.F.R. Parts 13 and 14, dictate the necessary procedures for importing fish, plants, and wildlife into the United States. Pursuant to 50 C.F.R. § 23.20(c), importers must have a valid CITES document to engage in international trade in any CITES specimen.

6. The ESA was enacted to provide a program for the conservation of endangered and threatened species. Pursuant to 16 U.S.C. § 1538(a)(1)(A), it is unlawful for any person subject to the jurisdiction of the United States to import any endangered species into the United States. Pursuant to 16 U.S.C. § 1538(a)(1)(E), it is unlawful for any person to knowingly deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any endangered species. Under the ESA, the term "endangered species" includes any species, or part thereof, included on the "List of Endangered or Threatened Wildlife," found in 50 C.F.R. § 17.11.

7. The snow crane, or Siberian crane (*Leucogeranus leucogeranus*), is listed within CITES as an Appendix I species. The dhole, or Asiatic wild dog (*Cuon alpinus*), is listed within CITES as an Appendix II species.

8. Pursuant to 42 C.F.R. § 71, biological samples imported into the United States from a foreign country are typically required to have documentary proof that the samples are not dangerous, how the samples were rendered safe, and how the sending laboratory confirmed it was now safe.

### THE DEFENDANT'S CONDUCT

9. PERELMAN is a citizen of Russia and was, at all times relevant to this Statement of Facts, a legal permanent resident of the United States.

10. On August 19, 2022, PERELMAN arrived at Washington Dulles International Airport on Turkish Airlines flight 187 from Russia. While filling out her Customs Declaration, CBP Form 6059B, in the containment area, PERELMAN made a negative declaration for Section 11(b), "meats, animals, animal/wildlife products," and Section 11(c),

3

"disease agents, cell cultures, snails," thereby falsely representing that she was not brining any such items into the United States.

11. During a baggage inspection, PERELMAN told a customs officer that, as a researcher at the Institute of Molecular & Cellular Biology in Novosibirsk, Russia, she does genetic sequencing of animal and reptile DNA to study evolution. PERELMAN explained that she does not work specifically for the government of Russia, but that she works remotely as a researcher at the Institute of Molecular & Cellular Biology, which is funded by government of Russia. PERELMAN does not currently work for an entity in the United States, nor did she at the time. She also said that she had researcher contacts from her time doing her post-doctoral work at the National Institutes of Health.

12. During the baggage inspection, customs officers found a 12-inch by 12-inch by 14-inch Styrofoam cooler labeled "Research Samples," which contained pieces of dry ice along with nine empty-appearing microcentrifuge tubes and 10 small vials with a yellowish substance. When asked about the tubes, PERELMAN informed the customs officer that the vials and tubes contained cell lines and DNA samples and that the nine microcentrifuge tubes contained varying amounts of a DNA buffer solution. PERELMAN stated that they contained samples of mostly mustelid DNA, and other species, that she planned to have sequenced in the United States for her research in Russia. PERELMAN did not produce any supporting documents for her samples outlining any of the required information.

13. PERELMAN said that the samples were suspended in a freezing/transport medium containing fetal bovine serum, which also contained dimethyl sulfoxide and Alpha Minimum Essential Medium to help preserve the samples. PERELMAN agreed that bovine serum would

4

technically be considered an animal product. PERELMAN also mentioned that this serum did not contain disease agents or anything harmful.

14. Upon questioning by a Homeland Security Investigations ("HSI") agent, PERELMAN agreed that her samples fit the definition of a cell culture on the CBP Form 6059B. Since box 11(c) on the form listed "disease agents" in addition to "cell cultures," PERELMAN first said that she had not wanted to check the box declaring her possession of wildlife products and cell cultures, because she was concerned that customs officials might think that the vials contained a disease agent. PERELMAN said that she was concerned that if she declared the samples, customs officials would seize the samples and ask her unwanted questions. PERELMAN said that she knew that the samples were not dangerous material and therefore did not feel the need to overcomplicate the situation by declaring the samples.

15. PERELMAN admitted that she knew about some of the regulations required for the transport of cell cultures and stated one of her previous laboratories had a full-time employee to handle the complex sample transmission paperwork. PERELMAN reiterated that she wanted her cell lines sequenced without any problems, and feared that if she had declared her possession of the cell cultures on her Customs Declaration, then there would be too many questions, and she did not have sufficient paperwork with her to answer all of the questions from customs officers and HSI agents. PERELMAN admitted that she intentionally made the false denial on the Customs Declaration to avoid scrutiny of her biological samples by customs officials.

16. Upon questioning by HSI agents, PERELMAN said that the nine microcentrifuge tubes contained biological samples, mostly of mustelids such as mink and Siberian polecat. While neither mink nor Siberian polecat is an endangered species under U.S. law or under

CITES, the tubes did contain biological samples of dhole and Siberian crane—both endangered species under U.S. law and CITES.

17. PERELMAN admitted that some of the samples she imported were of animals that may have been regulated by CITES, but that she was uncertain about any specific CITES status of the particular animal samples that she had. PERELMAN said that, although some of the samples used as a starting material for the derived cell lines that she brought were obtained from a zoo (and she did not harvest any animals), she lacked any proper importation paperwork that may have allowed her to lawfully import the samples by proving that.

18. PERELMAN reiterated that the samples she imported did not contain any pathogens or diseases. She stated that her lab in Russia does not research viruses or dangerous pathogens and that they do not work on military or weapon projects.

19. PERELMAN stated that bringing the vials from Russia was her last-minute decision, and she was aware that it would take a long time to go through the proper authorization process with the United States government. PERELMAN also mentioned that there was "no easy way" to do the paperwork. PERELMAN stated that she brought the biological samples without proper customs authorization because she believed that, in the absence of paperwork that she did not have with her, the samples would not have been admitted had she declared them.

20. Of the 19 samples that PERELMAN attempted to introduce into the United States on August 19, 2022, only two contained biological material derived from endangered species protected by CITES: Siberian crane and dhole. Most of the rest contained mustelid cells or mouse DNA or DNA of a species in the Ochotona genus commonly known as "pika."

21. PERELMAN's actions in failing to declare the vials of cell lines and DNA were in furtherance of an attempt to avoid and defeat the United States customs laws, but not to defraud the United States of revenue. Had she declared the vials of DNA and cell lines as required by law, no tariff on them would have been due.

22. This statement of facts includes those facts necessary to support the plea agreement between PERELMAN and the United States. It does not include each and every fact known to PERELMAN or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding PERELEMAN's case.

23. PERELMAN's actions, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____
Cristina C. Stam
Gordon D. Kromberg
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between me and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*Polina Perelman*
Polina L. Perelman

I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

*Mark D. Cummings*
Mark D. Cummings
Attorney for Polina L. Perelman

8